UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-61068-CIV-MARRA/JOHNSON

CARLISLE WILSON,

        Plaintiff,

vs.

BROWARD COUNTY, a political
subdivision of the State of Florida,

        Defendant.

_____/

## ORDER AND OPINION

    This cause is before the Court upon Defendant's Motion for Judgment as a Matter of Law, filed December 18, 2006.  (DE 253.)  The Court reserved ruling on Defendant's motion at the close of Plaintiff's case at trial and after the close of all the evidence.  The matter has been fully briefed and is now ripe for review.  The Court has considered the motion, the entire record, and is otherwise fully advised in the premises.

## I.    Background

    Pursuant to Plaintiff's Amended Complaint, Plaintiff Carlisle Wilson seeks compensatory, declaratory, and injunctive relief for alleged violations of the Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (Count I), and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a) (Count II).  Plaintiff's claims are premised on the actions of Joe Spicer, a Broward County bus driver, who allegedly failed to properly secure Mr. Wilson's wheelchair to the floor of the Broward County bus.

At trial, Broward County moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) at the conclusion of Plaintiff's case-in-chief and again at the close of all the evidence. The Court reserved ruling and submitted the case to the jury. On January 3, 2007, the jury found that Defendant's bus driver failed to assist Plaintiff with the securement system, but that such failure was not the result of deliberate indifference. (DE 263, Jury Questions 2 & 3.) The jury also found that Broward County failed train its bus drivers to proficiency and that this failure was the result of deliberate indifference. (DE 263, Jury Questions 4 & 5.) The jury concluded that this failure caused past damages sustained by Plaintiff for hospitalization, medical, and nursing care and treatment, in the amount of $34,132.00. (DE 263, Jury Question 11.) The jury found for Defendant on all other issues.

Broward County argues in its motion that Plaintiff has not established a legally sufficient evidentiary basis for a reasonable jury to conclude that Defendant failed to train its bus drivers to proficiency, or, alternatively, that any such failure was the result of deliberate indifference. Plaintiff asserts the jury verdict was deliberately and carefully crafted and was supported by the evidence.

## II.    Legal Standard

Pursuant to Rule 50(1), "[a] district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272, 1279 (11th Cir. 2005) (citation omitted). The Court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id.* Although the district court, in considering a motion for judgment as a

2

matter of law, must construe the evidence and reasonable inferences there from in the light most favorable to the non-moving party, the non-moving party "must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Campbell v. Rainbow City, Alabama*, 434 F.3d 1306, 1312 (11th Cir. 2006).

**III.    Discussion**

    **A.    Facts**

It is undisputed that on March 23, 2006, Mr. Wilson was picked up at the Galleria Mall bus stop by Broward County bus driver Joe Spicer. Plaintiff testified that Mr. Spicer activated the bus ramp on the Broward County Bus, enabling Mr. Wilson to board the bus, and then lifted the jump seat to allow Plaintiff to enter the wheelchair securement area. Mr. Wilson testified that Mr. Spicer placed Mr. Wilson's bus fare into the fare box but then failed to offer Plaintiff assistance in using the four-point wheelchair securement system. Mr. Spicer testimony differs. Mr Spicer testified that he did ask Mr. Wilson if Mr. Wilson needed assistance with the securement system. According to Mr. Spicer, Mr. Wilson refused the offer.

In any event, Plaintiff was not secured using the Broward County Bus' four point securement system. Rather, Mr. Wilson activated his own wheelchair locks, located on the wheelchair, and the bus continued on its route.

Upon arrival at Mr. Wilson's stop, Mr. Wilson testified that he released his right wheelchair lock in preparation to de-board the bus. However, according to Mr. Wilson's testimony, the bus then lurched forward causing Mr. Wilson to fall over the right side of his wheelchair. The bus driver then lifted him back into his wheelchair and wheeled him off the bus.

3

**B.    Failure to Secure**

Based on Mr. Wilson's testimony, there was sufficient evidence for a reasonable jury to conclude that Mr. Spicer failed to offer Plaintiff assistance in securing his wheelchair.

**C.    Failure to Train to Proficiency**

### *Standard*

As stated in the legal instructions given by the Court to the jury, the ADA requires that "[e]ach public or private entity which operates a fixed route or demand responsive system shall ensure that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities." 49 C.F.R. § 37.173. During deliberations, the jury asked the Court for the definition of "training to proficiency." The Court responded with the following definition: "As to proficiency, it means that every bus driver of Broward County who provides wheelchair securement services must have been trained so that he or she knows what needs to be done to provide the service in the right way consistent with the legally permissible policies and procedures adopted by Broward County."

The Court crafted this definition after consulting Appendix D to Part 37 of the Code of Federal Regulations, titled "Construction and Interpretation of Provisions of 49 C.F.R. Part 37." The Appendix was created to explain the Department of Transportation's construction and interpretation of the provisions found in 49 C.F.R. Part 37. 49 C.F.R. Pt. 37, App. D. The Department recognized that the regulations applied to different types of organizations with varying resources: "we believe that training should be conducted in an efficient and effective manner, with appropriate flexibility allowed to the organization that must carry it out." *Id.*

4

Further clarifying what it means to "train to proficiency,"and serving as the model for the Court's response to the jury question, the Department instructs that every employee who is involved with service to persons with disabilities "must have been trained so that he or she knows what needs to be done to provide the service in the right way." 49 C.F.R. Pt. 37, App. D. The Appendix also clarifies that "[w]hile there is no requirement for refresher or recurrent training, there is an obligation to ensure that, at any given time, employees are trained to proficiency." *Id.* If an employee forgets what he was told in past training sessions and no longer knows what needs to be done to serve individuals with disabilities, he or she does not meet the standard. *Id.*

Perhaps most salient to the issue at hand, "training must be appropriate to the duties of each employee . . .[a] bus driver must know how to operate lifts and securement devices properly." *Id.* Finally, the training requirement goes to both technical tasks and human relations. *Id.*

### *Uncontroverted Evidence Broward County Trained its Bus Drivers*

It is uncontroverted that Broward County's Mass Transit Division trains it bus drivers through an initial training course where they receive written, oral and hands-on training on how to use the four-point wheelchair securement system employed on Broward County buses.[1]  They

---

[1]     Joe Spicer's trainer, Robert Dorn, explained the initial training: "There was lectures, there was -- on different topics, which consists of bus maneuvers, defensive driving, passenger relations and emergency action handling. There was little quizzes afterwards. There was slide presentations, videos, guest speakers. And, of course, there was hands-on training in actually the bus in the bus parking lot. (Dorn Transcript, DE 283, p. 13.) Dorn explained part of the ADA training (Dorn Transcript, DE 283, pgs. 13-24):

> A. I trained Joe to be -- ask in a professional tone of voice if the wheelchair passenger needed any type of assistance upon boarding the bus and when they got

also receive training on the requirements of the ADA, including how to be sensitive and

responsive to disabled passengers' needs and rights.[2]

---

> -- when a passenger got onto the bus and upon getting into the securement system on a bus, and to be very -- ask him if he wanted to -- ask if he or she wanted to be restrained.
>
> Q. What kind of things outside the classroom did you do to train Joe in how to assist wheelchair passengers?
>
> A. About -- actually, I believe there was one from we picked up from I think it was Philly that actually showed a wheelchair passenger getting on a bus, getting locked into position, okay, and asking the passengers to basically move out of the securement area and explain that if they didn't move, and so on and so forth, that actually you couldn't do anything if they refused to move out of the securement area. And then it says about the securement area, and they had the policy that they use their securement devices and we would explain -- I would explain to them about our policy when it came to securement devices...
>
> Well, Broward County policy is highly recommend that the wheelchair passenger uses the securement devices, but the bottom line is that the wheelchair passenger has freedom of choice, and the wheelchair passenger can refuse to be secured...
>
> If the wheelchair passenger refuses, the operator would inform the wheelchair passenger that they can choose to continue en route by locking their wheelchair.

[2]   Upon being questioned about Defendant's Exhibit TT, a booklet from the Transportation Safety Institute, Mr. Dorn replied "It's a guidelines for assisting customers with disabilities . . this booklet is used for not only with Broward County Mass Transit, probably throughout the United States. A lot of transit use this as a guideline for training new bus operators." (Dorn Transcript, DE 283, p. 23.) The exchange continued:

> Q. Now, directing your attention to page 96 of exhibit TT, where it says, "Guidelines for providing service to customers with disabilities. . ."Anticipate your customer's needs, but always ask if the customer wants assistance. Never provide assistance without first asking if assistance is needed.". . .Is this consistent with what you taught Joe Spicer in 1995?
>
> A. Yes.
>
> (*Id.* at 23-24.)

It is also not in dispute that Broward County has a *permissive* wheelchair policy whereby each wheelchair passenger has the option of being secured. Pursuant to Broward County's policy, it is undisputed that Broward County trains its bus drivers to ask wheelchair passengers if they would like assistance securing themselves in the four point securement device.[3] If a passenger refuses assistance and does not want to be secured using the four-point securement device, Broward County allows the passenger to ride using only the locks on his or her wheelchair. In other words, passengers are not forced to accept assistance in securing their wheelchair. If the passenger wishes to ride the bus without being secured - using their own wheelchair locks to secure the wheels - Broward County provides wheelchair passengers this choice. On this issue, the Court instructed the jury that, "as a matter of law, it is lawful for Defendant to adopt and implement a policy which allows a wheelchair passenger to choose whether or not he or she wants to be secured." (Jury Instructions DE 261.) The parties agreed to this instruction at the charge conference, as Dr. Richardson, Defendant's expert and the former Director of the Office of ADA Coordination for Dade County, testified at trial that a permissive wheelchair policy is lawful and complies with the ADA.[4] (Richardson Transcript, DE 283, pgs.

---

[3]       County's training classes included a slide show presentation on the ADA which stated "OPERATOR MUST ASK THE PASSENGER IF HE/SHE WANTS TO BE SECURED." (Trial Exhibit WW, p. 3.); Broward County Transit's Rules and Regulations, Operator's Manual reads: "If the passenger refuses to be locked or belted, allow the person to make the choice of continuing the trip using only the locking devices on the wheelchair." (Defendant's Trial Exhibit SS pgs. 32-33.)

[4]       William Sorrells, the superintendent responsible for safety and security at Broward County's Mass Transit division, also testified that: "Under ADA you're required to do certain things. And as it's indicated here, that help to secure or secure a passenger in a wheelchair. If they don't want to be secured in a wheelchair, you can't force them. And that's what we were taught, and that's what Americans with Disabilities Act taught us right from the start, that we can't force anybody to do anything. We can encourage them and we can ask them. If they

7

72-84.)("And it was our understanding that you could have a permissive system or a mandatory system, but your couldn't mix the two.")

Finally, it is undisputed that after the initial training, bus drivers are required to attend a refresher in-service training course every two years.[5] Bus drivers also had to be trained when new equipment, such as the four-point securement system, was installed on the buses.[6] The bus driver who failed to secure Plaintiff attended initial training, new equipment training, and refresher in-service training. In order to further ensure that bus drivers are carrying out their duties properly in the field, Broward County Mass Transit relied on passenger complaints.[7]

Defendant's expert witness was Dr. Diana Richardson, the former Director of the Office of ADA Coordination for Dade County. Unlike Broward County, Dade County has a mandatory wheelchair securement policy whereby Dade County bus drivers automatically secure wheelchair

---

do it, fine; if they don't, we can't embarrass them or humiliate them into doing anything, nor can we eject them from a bus. (Sorrells Testimony, DE 283-2, p. 105.)

[5] "Okay. There would be the initial training. That's when they first come into Mass Transit. Then they have in-service training two years after that. . . [e]very two years." (Dorn Transcript, DE 283, p. 12.)

[6] "And then they would have -- when there's a new piece of equipment that came in and there was new accessories or new type of controls on the buses, that they would have additional training for that. And they had to be trained on it before they would be able to operate that piece of equipment." (Dorn Transcript, DE 283, p. 12.) When asked if Joe was received new training on how to use the four-point securement system when the system was instituted, Mr. Dorn replied "Yes, most definitely." (*Id.* at p. 26.)

[7] "And, of course, any complaints that would come in on a particular bus operator would be followed up immediately by either a supervisor or some management personnel, to see if the complaint was, in fact, true, and, of course, rectify it if a bus operator is deficient in any way." (Burger Transcript, DE 283, p. 15 lines 6-10.); "Well, typically when drivers don't perform as they are instructed, the passengers will let us know." (Walton Transcript, DE 283, p. 84 lines 23-24.)

8

passengers without giving the passenger the option of riding unsecured. Dr. Richardson reviewed Broward County's training procedures, including the manuals used in the classroom and County's Rules and Regulations, and testified that Broward County's training of its bus drivers was adequate and met industry standards. (Richardson Transcript, DE 283, p. 90, lines 11-14.)

### *Plaintiff's Evidence*

Plaintiff asserts that the evidence at trial supports a finding that Broward County failed to train its drivers to proficiency based on two arguments. First, Plaintiff attacks Broward County's permissive wheelchair policy as unsafe. Second, Plaintiff argues that Broward County's Operator's Manual is inconsistent with its securement policy and that Broward County lacks a mystery rider program to ensure driver compliance with their securement policy. Plaintiff concludes that Broward County's insufficient training materials coupled with its failure to ensure its drivers are conforming to their training through a mystery rider program amounts to a failure to train to proficiency. Viewing the evidence in a light most favorable to Plaintiff, the Court concludes Plaintiff failed to provide a sufficient evidentiary basis for a reasonable jury to find Broward County failed to train its drivers to proficiency.

Plaintiff continuously attacked Broward County's permissive wheelchair policy throughout the trial and in its various briefs. Plaintiff cites to testimony of its expert Dr. Resnick and Defendant's expert Dr. Richardson, for the proposition that it is an unsafe to allow wheelchair passengers to ride unsecured. Plaintiff then crafts arguments asserting that based on the danger of wheelchair passengers riding unsecured under Broward County's policy, Defendant (i) failed to train to proficiency, (ii) was willfully ignorant of wheelchair needs and therefore

deliberately indifferent, and (iii) should not be permitted to have a permissive policy.[8]

Regardless of how Plaintiff states the argument, at its core, it is an attack on a policy that is

legally permissible.  As such, Plaintiff's complaints about the permissive policy are without

merit.

Plaintiff also alleges that there were deficiencies in Broward County's Rules and

Regulations Operator's Manual which contributed to a failure to train to proficiency.  The

Manual states in pertinent part:

> If you encounter a wheelchair passenger, offer whatever assistance is needed to
> safely board the passenger via the wheelchair lift or ramp and allow them time to
> lock the wheelchair in place before moving the coach. . . .
>
> If your bus has a locking device [clamp] only, employ it. If the coach has a belting
> system [four point securement system] fasten the belts to secure the wheelchair. If the
> passenger refuses to be locked or belted, allow the person to make the choice of
> continuing the trip using only the locking device on the wheelchair. Also, encourage the
> individual to use the seat belt provided on the bus and assist if requested or necessary.

(Plaintiff's Trial Exhibit 16, p. 33.)  Plaintiff's argument is two fold.  First, Plaintiff argues that

the written instructions contained in the manual are in conflict with Broward County's "ask first"

policy because the text only instructs the operator to "assist if requested or necessary" and does

not instruct the operator to "ask first."  Plaintiff argues that these instructions are ambiguous and

could lead the operator to assume a wheelchair passenger can secure himself with the four-point

securement system without assistance.  Plaintiff asserts this creates a conflict between the written

training materials and Broward County's initial training which trains its operators to ask first.

Plaintiff cites to the testimony of County Officials (William Sorrells, the superintendent

---

[8]      Plaintiff's expert Dr. Resnick testified "I would say that [Broward County's bus
driver] training was not effective, because it did not allow Mr. Spicer to perform in a safe way."
(Resnick Transcript, DE 283, p. 79.)

responsible for safety and security at Broward County's Mass Transit division, and Raymond Burger, superintendent of training at Broward County's Mass Transit division) who testified that they did not know that passengers with wheelchairs would be unable to use the four-point securement system without assistance. (Burger Transcript, DE 283, p. 21; Sorrells Transcript, DE 283, p. 17.)

Second, Plaintiff argues that the manual is outdated because directions in the text refers to the wheelchair securement device formerly used on Broward County Buses called the "clamp." A wheelchair passenger could use the clamp device by backing their wheelchair into the clamp securement device. Plaintiff points to the trial testimony of Robert Dorn (bus driver trainer), William Sorrels (superintendent responsible for safety), and Robert Roth (former head or second in command at Broward County Mass Transit) who testified they were unsure whether Broward County had changed its training materials since it had eliminated the clamp securement device. (Dorn Transcript, DE 283, p. 59; Sorrells Transcript, DE 283, p. 98, 109; Roth Transcript, DE 283, p. 55.)  Because the manual provides directions for a securement device that is no longer in use, and Broward County has failed to update the materials, Plaintiff contends that this failure to update weighs in Plaintiff's favor.

Dr. Resnick, Plaintiff's expert, testified that "Broward County failed to eliminate from its training materials conflicting provisions. There are some that directly conflict with the federal CFRs, and there's some that conflict with each other. And that's not a very effective way of training people." Dr. Resnick concluded this was ineffective because operators could get confused, but "even more importantly, they don't know which provisions to follow, and they're either likely to think that -- interpret them as not being important if they can't be -- if they're not

11

consistent, or they just, in the field when it comes time to actually make a decision, they don't

know which one to follow." (Resnick Transcript, DE 283, p. 71.)

Plaintiff also argues that Dr. Richardson testified that Broward County's policy was

inconsistent. A complete review of Dr. Richardson's testimony demonstrates that Plaintiff is

simply taking Dr. Richardson's testimony out of context. [9] It is uncontroverted that Dr.

Richardson's expert opinion was that Broward County's training policies were adequate.

---

[9]   Plaintiff cites to the following:

Q. So part of an effective training program is, of course, having proper written
materials, would you agree with that, Dr. Richardson?
A. Yes. . .

Q. And so in training a program to – in developing a training to train these drivers – of
course, consistent training written materials, right?
A. Yeah.

* * *

Q. Sorry. So just one more, Dr. Richardson. Page 3[-]50 of [Plaintiff's Exhibit 18,
Broward's Operator's Manual for Passenger Relations, which states: "Its your
responsibility to secure the wheelchair with all the tie downs provided by the
manufacturer"] . . .

Q. It's inconsistent with Broward's policies and procedures?
A. Yeah, if you just look at that.

(Richardson Transcript, DE 283, pgs. 143-146.);(Richardson Transcript, DE 283, pgs.
125-131.) Plaintiff takes Dr. Richardson's testimony out of context. Dr. Richardson stressed
that the manual was only guidance and was not Broward County's policy. (*Id.*) Dr. Richardson
testified that if a passenger answered in the positive to the offer of assistance, then the manual
was consistent with their policy. (*Id.*) It was only after Plaintiff's counsel took sentences out of
context and pressed Dr. Richardson on whether a single sentence was inconsistent with Broward
County's policy did Dr. Richardson respond as indicated above. (*Id.*) Dr. Richardson testified
that when the manual and the policy were looked at together, they were consistent. "I think its
consistent with it, but it's a sentence taken out of context to their policies and procedures." (*Id.*
at p. 129 lines 4-5.) It was only after this qualifying statement did Dr. Richardson state "Yeah, if
you just look at that." (*Id.* line 10.)

(Richardson Transcript, DE 283, pgs. 72-84.)

Plaintiff's arguments with respect to Operator's Manual are unavailing. First, it is clear that the language in the manual which Plaintiff contends is ambiguous does not relate to the securement of the wheelchair, but rather to getting the wheelchair passenger onto the bus. The manual states: "If you encounter a wheelchair passenger, offer whatever assistance is needed *to safely board the passenger via the wheelchair lift or ramp* and allow them time to lock the wheelchair in place before moving the coach." (emphasis added.) There was no dispute that many wheelchair passengers are capable of getting onto the ramp or lift without assistance, and Plaintiff fits into this category. When addressing the question of securing the wheelchair with the securement system on the bus, it directs the bus driver to "employ [the locking device]" and "to fasten the belting system", unless the passenger refuses. In the event the passenger refuses assistance, the driver, consistent with the Broward County policy is directed to "allow the person to make the choice of continuing the trip using only the locking device on the wheelchair." (Plaintiff's Trial Exhibit 16, at page 33.) There is nothing in the manual which suggests that the bus driver is to decide whether the passenger is or is not capable of securing the wheelchair without assistance.

Further, Plaintiff's attack on Messrs. Sorrells' and Burger's lack of knowledge on the capabilities of wheelchair passengers to utilize the securement system without assistance is misplaced. Broward County's permissive policy - asking first and allowing passengers to ride unsecured - was legally permissible and the only salient question is whether Broward County trained its drivers to proficiency *on that policy*. Regardless of the safety risks associated with riding unsecured to the floor of the bus, Broward County is permitted, as a matter of law, to have

13

a permissive wheelchair securement policy. Any further argument as to Broward County Mass

Transit Officials' lack of knowledge that disabled passengers cannot secure themselves without

assistance or that it is unsafe for passengers to ride unsecured, is a veiled attack on a legally

permissible policy and therefore inapposite.

Similarly, the Operator's Manual inclusion of instructions for the clamp device does not

render Broward County's training deficient. It is uncontroverted that Broward's drivers are

thoroughly trained on how to use the four-point securement device. The fact that Broward

County has not removed instructions in the Operator's Manual on the clamp device does not

affect the analysis of whether Broward County has trained its drivers to proficiency on how to

operate the four-point securement device found on Broward County buses. There is simply no

competent record evidence from which a reasonable jury could have concluded that Broward

County failed to train its drivers to proficiency. The failure of a single bus driver to follow the

Broward County policy does not constitute evidence that the entire training system is deficient.

### Failure to Ensure Compliance

Plaintiff's expert Dr. Resnick testified that training to proficiency means:

> [D]oes the person learn the material and use it in a way that satisfies the requirements of the system? So from a safety point of view, what we look at is does the person learn the material well enough that they can behave in a way that achieves safe system performance. And that can't just be did they learn it the first time, but that's also did they learn the content, did they learn to apply it, and are they going to remember it when they have to use it in the real world."

(Resnick Transcript, DE 283, p. 59.) Dr. Resnick also testified that in designing a training

program, one must consider not just the test questions, but must also consider how the training

program "ensure[s] that the individual has actually learned the material to the level of

14

performance that is necessary for them to operate the system." (Resnick Transcript, DE 283, p.

46.) To that end, Plaintiff argues Broward County failed to train to proficiency because it did not

have a mystery rider program in place whereby mystery riders would ride the buses and observe

whether Broward County bus drivers were assisting passengers as they were trained to do.

For support, Plaintiff points to Dr. Richardson's testimony where she described how

Dade County utilizes a mystery rider program to determine whether the wheelchair securement

systems were actually being used by the drivers to secure the passengers. (Richardson

Transcript, DE 283, pgs. 150-155.) Plaintiff also highlights how Dade County's drivers could be

disciplined by a supervisor if they failed to follow their training protocols once in the field. *Id.*

Plaintiff then makes the comparison to Broward County and points to testimony

demonstrating that Broward County does not have a mystery rider program and that there are no

adverse consequences for a Broward County driver if he or she does not follow protocol in the

field. For the former, Plaintiff directs the Court to the testimony of Christopher Walton, the

current head of Broward County's Mass Transit division, who testified as follows:

> Q. And just to make sure, Broward County does not monitor in any way, shape or form,
> its drivers' on-the-road compliance with [Broward's policy that bus drivers are to ask
> wheel chair passengers if they want or need assistance securing their wheel chairs]
> correct?
>
> A. No.
>
> Q. That's incorrect?
>
> A. No, that is correct. We have -- there's no mechanism to do that.
>
> Q. Why not?
>
> A. Because I guess if there were a mechanism to do that, it'd be the same mechanism that

we use to monitor all of our employees in all of their capacities in all of their jobs.
There's an expectation that we have of our staff that they will do the job they are trained
to do.

(Walton Transcript, DE 283, pgs. 91-92.) With respect to the lack of adverse consequences for

drivers who fail to perform in the field, Plaintiff directs the court to the testimony of Raymond

Burger, superintendent of training at Broward County's Mass Transit division, and Robert Roth,

who from 1984 through October of 2005, held either the number one or the number two position

at Broward County's Mass Transit division. However, Plaintiff's reliance is misplaced. Both

officials testified that they *didn't know* if there were adverse consequences; they did not testify

that there were not any adverse consequences for driver's failures to comply in the field. (Roth

Transcript, DE 283, pgs. 67-68; Burger Transcript, DE 283, pgs. 31-32.)

Defendant paints a different picture. As noted above, it was undisputed that the Broward

County drivers received biannual refresher in-service training[10] and Broward County monitored

their driver's compliance through passenger complaints.[11] There is also testimony from other

witnesses that Broward County did have spotters or mystery riders on their buses to evaluate the

proficiency of its drivers with the mystery riders submitting written reports that include

suggestions if retraining is necessary. Raymond Burger, superintendent of training at Broward

County's Mass Transit division, testified that Broward County used to send out instructors to

observe the new students and that they now they have a company, "referred to like the mystery

---

[10]     Raymond Burger, superintendent of training at Broward County's Mass Transit
division, testified "Well they return on the biannual training. And, again, if they're not
performing their duties correctly and the operations section feels that after they've called them in
and warned them, or whatever their procedure is over there, they send them back to us for what
we call one-on-one individual retraining." (Burger Transcript, DE 283, p. 31.)

[11]     Burger Transcript, DE 283, pgs. 15-16; Walton Transcript, DE 283, pgs. 84-85.

riders" that ride the buses, grade the bus operators on a variety of different things, and submit

reports to Broward County. (Burger Transcript, DE 283, pgs. 14-15.) Robert Dorn, a bus driver

trainer at Broward County's Mass Transit division that trained Mr. Spicer, testified that there are

spotters riding on Broward County buses, not only on paratransit buses, that observe driver

behavior and then report back to the operations superintendent or assistant director. ( Dorn

Transcript, DE 283, pgs. 32-33.) Even Chris Walton, on whose testimony Plaintiff relies, seems

to contradict himself on the issue of mystery riders:

> Q. Okay. Now, why are Broward County's paratransit passengers receiving this
> benefit [monitoring the quality of service of the drivers] but the passengers of
> Broward County's regular bus service are not?

> A. Well, actually, the same company that monitors the paratransit function on a
> more limited basis monitors the fixed route, but the parameters that they look for
> are different.

(Walton Transcript, DE 283, p. 86.)

Even assuming that Walton's conflicting testimony provides evidentiary support for

Plaintiff's assertion that Broward County does not have mystery riders, the lack of a mystery

rider program is not sufficient evidence from which a reasonable juror could conclude that

Broward County failed to train its driver to proficiency. Although a mystery rider program may

be beneficial, it is not the standard by which all training programs must be judged; simply

because Dade County employs a mystery rider program it does not follow that all other entities

are required to employ a similar program lest their training is deemed deficient. As discussed

previously relative to the Code of Federal Regulations, the ADA does not require organizations

to effect the *best* training methods, rather only sufficient training protocols to ensure that drivers

are "trained so that he or she knows what needs to be done to provide the service in the right

17

way." 49 C.F.R. Pt. 37, App. D. The Department recognizes that there will not be a single

universal method by which organizations train its drivers, rather, "training should be conducted

in an efficient and effective manner, with appropriate flexibility allowed to the organization that

must carry it out." *Id.* The Department also states in the appendix that refresher training is not

required. *Id.*

 Here, the record evidence demonstrates that Broward County brought its drivers back in

for refresher in-service training every two years to ensure that their employees were trained to

proficiency. 49 C.F.R. Pt. 37, App. D CFR ([w]hile there is no requirement for refresher or

recurrent training, there is an obligation to ensure that, at any given time, employees are trained

to proficiency.") Broward County also monitored passenger complaints, reasonably expecting

complaints to be lodged if drivers were not properly assisting passengers with wheelchairs. Use

of a mystery rider program is not required to train to proficiency, and the lack of such a

monitoring system cannot provide a reasonable basis for a finding of failure to train to

proficiency. Accordingly, Defendant's motion for judgment as a matter of law with respect to

Plaintiff's claim that Defendant failed to train its drivers to proficiency is granted.[12]

### D.   *Deliberate Indifference*

 In this Court's previous order on the parties Motions in Limine (DE 241), the Court

recognized that the Eleventh Circuit Court of Appeals has established that plaintiffs who proceed

---

[12]   Testimony from Plaintiff's expert, Dr. Caddy, that Broward County drivers should have asked in a more sensitive manner, approaching the wheelchair passenger and asking at a closer distance, does not disturb the Court's conclusion. The regulation only requires that the drivers ask in a "respectful and courteous way," not the *most* sensitive way. This testimony alone or incorporated with the rest of the record evidence, is also insufficient to support a jury verdict for Plaintiff on this issue.

under a theory of disparate treatment in section 504 actions must prove intentional discrimination

or bad faith in order to recover compensatory damages. *Wood v. President and Trustees of*

*Spring Hill College*, 978 F. 2d 1214, 1219 (11th Cir. 1992). Good faith attempts to pursue

legitimate ends are not sufficient to support an award of compensatory damages under section

504." *Id.* (citing *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F. 2d 1403,

1427-28 (11th Cir. 1985)). The Court agreed with the Ninth Circuit Court of Appeals in *Duvall*

*v. County of Kitsap*, 260 F. 3d 1124, 1138 (9th Cir. 2001), and held that deliberate indifference

is the proper standard for proving intentional discrimination in Title II ADA and Section 504

claims.

After the charge conference in this case, the parties agreed on the following jury

instruction defining deliberate indifference:[13] "Deliberate indifference means that Defendant

knew or should have known of a need to accommodate Plaintiff's disability and consciously and

knowingly failed to provide the accommodation. Deliberate indifference is more than

negligence." (Jury Instructions, DE 261.)

Even assuming arguendo that Broward County failed to train its drivers to proficiency and

the jury's verdict on that question was to stand, the record is devoid of any evidence that such

failure was the result of deliberate indifference. Plaintiff argues that Defendant is in the "big

leagues" as it provides almost 35 million passenger trips per year and has a budget of over $110

million. Plaintiff recycles many of his earlier arguments, first asserting that Broward County's

---

[13]     While agreeing to the definition of deliberate indifference, Defendant preserved
its objection to the Court's ruling that deliberate indifference was the proper standard for proving
intentional discrimination. Defendant maintains that a plaintiff must prove bad faith or
discriminatory animus in order to recover compensatory damages.

failure to conduct any type of follow up or monitoring of their drivers' performance is equivalent to driving down the road with one's hands over one's eyes. Plaintiff next attacks Broward's permissive securement policy, citing to its experts' testimony that allowing passengers to ride unsecured is unsafe and essentially forces disabled passengers to "choose safety" by inconveniencing, burdening, and delaying other passengers while their wheelchairs are secured. Plaintiff asserts this is really no choice at all. Finally, Plaintiff cites to Broward's Mass transit officials who testified they were unaware whether it was unsafe for wheelchair passengers to ride unsecured.

Plaintiff's arguments are without merit. Nothing in the record indicates that any failure to train was the result of deliberate indifference. Plaintiff's argument that Broward County fails to conduct follow up monitoring, even if true, is insufficient to support a finding of deliberate indifference. As detailed above, Broward County brings its drivers in for biannual refresher in-service training and monitors their drivers' performance through passenger complaints. Assuming Broward County did not have any type of mystery or spotter rider program, any such failure would be, at best, negligence. Negligence, however, is not sufficient to support a finding of deliberate indifference. (Jury Instructions DE 261.) Further, as discussed above, Broward County is permitted, as a matter of law, to have a permissive wheelchair securement policy regardless of the safety risks associated with wheelchair passengers riding unsecured. Finally, the fact that Broward County Mass Transit Officials may be unaware that some disabled passengers cannot secure themselves without assistance, or that it is unsafe for passengers to ride unsecured, is irrelevant since the Broward County policy is legally permissible.

The Court also finds that Broward County's training protocols qualify as good faith

20

attempts to pursue legitimate ends. *Wood*, 978 F. 2d at 1219. Accordingly, Broward County's Motion for Judgment as a Matter of Law is granted on the issue of Broward County's alleged deliberate indifference relative to the failure to train to proficiency.

## IV.   Conclusion

_____Consistent with the foregoing, it is hereby **ORDERED AND ADJUDGED** that Broward County's Motion for Judgement as a Matter of Law (**DE 253**) is **GRANTED** as follows:

1)      As a matter of law, Plaintiff has not presented a legally sufficient evidentiary basis for a reasonable jury to find that Defendant failed to train its drivers to proficiency.

2)      Alternatively, as a matter of law, Plaintiff has not presented a legally sufficient evidentiary basis for a reasonable jury to find that any failure to train to proficiency was the result of deliberate indifference.

3)      The Plaintiff has presented a legally sufficient evidentiary basis for a reasonable jury to conclude that Mr. Spicer failed to offer Plaintiff assistance in securing his wheelchair.

4)      The Court will hold a hearing on Plaintiff's claims for injunctive relief stemming

from the jury's finding that Mr. Spicer failed to assist Mr. Wilson.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 27th day of September, 2007.

Hon. Kenneth A. Marrra
United States District Court Judge

Copies furnished to:

All counsel of record

22